**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| **TAYLORS INTERNATIONAL SERVICES, INC.,** | : | |
| **Plaintiff,** | : | |
| **v.** | : | **Case No. ______________** |
| **AMENTUM SERVICES, INC.,** | : | |
| **Defendant.** | : | |

## COMPLAINT

This case arises from a prime contractor's refusal to honor a subcontract's core risk allocation on a food-services program in support of the U.S. Department of State ("DOS") mission in Iraq. For more than a decade, Taylors International Services, Inc. ("Taylors") reliably imported and delivered duty-free foodstuffs to support DOS personnel in Iraq under a subcontract administered by Amentum Services, Inc. ("Amentum"). Taylors' subcontract with Amentum squarely placed responsibility for customs clearance—and the resulting port, storage, and freight costs—on Amentum. However, in 2024, when Iraqi customs detained twenty-five refrigerated containers for months, Amentum failed to follow the subcontract's clear terms when it denied reimbursement for Taylors' costs and refused to allow Taylors to submit a passthrough request to DOS for equitable adjustment. Taylors continues to perform this subcontract diligently. Meanwhile, Taylors brings this action to enforce the subcontract as written and to recover the millions in costs and cargo losses caused by Amentum's breach.

## PARTIES

1. Taylors is a Louisiana corporation with its principal place of business at 2301 South College Ext., Lafayette, Louisiana 70508.

2. Defendant Amentum is a Delaware corporation with its principal place of business at 4800 Westfields Boulevard, Chantilly, Virginia 20151.

## JURISDICTION,VENUE, AND CHOICE OF LAW

3. This Court possesses diversity jurisdiction over this dispute because there is complete diversity of citizenship and Taylors' claims exceed $75,000. *See* 28 U.S.C. § 1332.

4. This Court possesses personal jurisdiction over Amentum because of the business Amentum transacts in this state. Va. Code § 8.01-328.1(A).

5. Venue is proper in this Court because Amentum resides in this District, as its principal place of business is located here. 28 U.S.C. § 1391(b)(1).

6. The parties contracted to apply the laws of the Commonwealth of Virginia to disputes, such as the present matter, that arose from the Subcontract.

## FACTUAL ALLEGATIONS

### Nature of the Case

7. This case concerns the proper interpretation of the balance of risks in a subcontract between Taylors and Amentum.

8. Amentum has a prime contract with DOS and a subcontract with Taylors to provide certain services. Under the subcontract, Taylors agreed to import duty-free foodstuffs for personnel serving at facilities belonging to DOS, including the U.S. Embassy ("Embassy") and the Baghdad Diplomatic Support Center ("BDSC") in Baghdad, Iraq. Successful performance of the subcontract

depended upon cooperation from several third parties with authority over imports, most notably DOS, the Embassy, and Iraqi customs officials ("Customs").

9. Mindful of the risks associated with reliance on non-contractual parties, Taylors agreed to enter into the subcontract because its clauses shifted responsibility for clearing imports through Iraqi Customs from Taylors to the prime contractor. Similar risk-shifting clauses made freight, port, and transport costs incurred in Iraq reimbursable, and granted Taylors an equitable adjustment in the event of changes to the subcontract. Amentum's predecessor-in-interest incorporated these risk-shifting provisions in the subcontract—and Amentum adopted them upon its acquisition of the prime contractor—because the same clauses existed in Amentum's prime contract with DOS, where they entitled Amentum to recover such costs from DOS.

10. Taylors performed the subcontract at issue for more than ten years before the events that gave rise to this dispute.[1] To facilitate this performance, Taylors contracted with vendors to deliver shipping containers of foodstuffs to Iraqi ports of entry, and Taylors received documentation from the Embassy to allow each container to pass through Iraqi Customs. This process broke down in April of 2024, however, when disputes between DOS and the Iraqi government led to the detention of twenty-five Taylors containers at the port of Umm Qasr for more than 200 days. By the time Customs finally released four of Taylors containers, the batteries that powered the containers' temperature monitoring devices had died, prompting the inspectors acting for or on behalf of Amentum in connection with inspection and acceptance ("inspectors") to reject the first four containers' contents without conducting a complete, contractually-required inspection.

[1] Taylors' performance also involved the participation of suppliers and vendors. This claim references "Taylors" to include these entities that performed work at Taylors' direction or on Taylors' behalf.

11. Amentum's response to this crisis violated the express terms of the subcontract in several ways. First, Amentum failed to secure the clearance of Taylors' containers for more than 200 days, which Amentum had a duty to do under the Subcontract and which Amentum could have accomplished either through coordination with the Embassy and Customs, or by paying customs duties not waived. Second, Amentum failed to inspect and accept the portion of Taylors' cargo that remained viable after delivery. Third, Amentum expressly changed the subcontract without an equitable adjustment when it ordered Taylors not to deliver its remaining containers to the Embassy and BDSC, allegedly to spare DOS the trouble of inspecting their cargo.

12. Amentum also breached its duty to cooperate, act in good faith, and deal fairly with Taylors. After Amentum ordered Taylors not to deliver its cargo to DOS, Taylors' only means of mitigating its damages and stopping daily demurrage, storage, and port fees accruing for each stranded container was to dispose of its cargo. But in January of 2025, Amentum ordered Taylors to standby and not destroy its cargo. Amentum then ignored months of Taylors' repeated requests for disposal authorization.

13. Amentum similarly refused to cooperate with Taylors in its effort to recover costs from DOS. During Taylors' continued performance in 2025, Amentum refused to submit a claim on Taylors' behalf to DOS, despite Amentum's promises to do so in January of 2025. Even after Taylors bore the cost of drafting a passthrough claim for Amentum to submit to DOS that would allow Amentum to recover its own costs arising from this dispute, Amentum refused to submit the claim to DOS.[2]

[2] Taylors does not assert any direct claim against the United States or DOS in this action and seeks relief solely from Amentum for breach of the Subcontract and related duties in its administration.

## Background

14. In September of 2013, the DOS awarded Amentum's predecessor in interest, PAE Government Services, Inc. ("PAE"), a contract for the provision of food services for DOS personnel in Baghdad. Though initially awarded for a transition period, a base period, and four 12-month option periods, DOS extended the contract for more than twelve years.

15. On September 24, 2013, PAE and Taylors executed Subcontract No. P1-0001443 ("Subcontract") for the performance of food services at DOS facilities under the BLiSS program in Iraq, including the importation and delivery of food items to DOS facilities in Iraq. Ex. 1, Subcontract. PAE modified the Subcontract several times over the next nine years to extend the Subcontract's period of performance and increase its value accordingly.

16. Amentum acquired PAE in February of 2022. Amentum continued to extend the Subcontract and Taylors performance to the present day.

## Relevant terms of the Subcontract

17. The Subcontract contained the following provisions that are relevant to this case.

18. Subcontract Section 3, "Scope of Work" ("SOW"), defined the food service (the "Work") that Taylors was required to provide. *Id.* at 2-3.[3] The SOW obligated Taylors to import center of the plate items and brand name favorite foods, while using local sources for a minimum of 35% of the total food served.

19. Subcontract Attachment B contained flow-down clauses from Amentum's prime contract with DOS. For the purpose of applying these clauses to the Subcontract, Attachment B specified that "the term 'Contractor' shall mean 'Subcontractor;'" and "the term 'Government'

---

[3] All page number references herein refer to the PDF page number and not the page number printed on the document itself.

shall mean 'PAE.'" Ex. 2, Attachment B at 1. Attachment B further provided that the "Subcontractor shall be bound to PAE to the same extent as PAE is bound to the Customer with respect to any obligation or requirement set forth below. . . [t]he benefits of such provisions shall extend to Subcontractor to the extent that PAE, through other provisions of this Subcontract, obtains such benefits on behalf of Subcontractor." *Id.*

20. Subcontract Section H.21(d) of Attachment B, "Customs Clearance," provided that "the Government will be responsible for **obtaining customs clearances** and for obtaining exemption certificates **or paying customs duties not waived**, for imported products, materials and equipment which are labeled and processed in accordance with the CO's Representative's instructions." *Id.* at 13 (emphasis added). This clause placed the duty and risk of obtaining customs clearance or paying un-waived duties squarely on Amentum, regardless of fault. This provision did not require that Amentum obtain these clearances through any specific method—the means of performance was left to Amentum's discretion, and this discretion explicitly included the payment of un-waived duties.

21. Section H.21(a) of Subcontract Attachment B, "Shipment and Customs Clearance," provided that imports of materials for contract performance "shall be considered cost reimbursable." *Id.* Costs such as "packing, handling, cartage, **overland freight**, ocean freight, transshipment, **port**, unpacking, **storage**, and **all other charges** in connection with obtaining and transporting the materials from their source to the project site **shall be allowable costs and reimbursable**" under the Subcontract. *Id.* (emphasis added).

22. Subcontract Section 10, "Inspection and Acceptance of Work," required Amentum to "physically inspect the Work, and witness or perform such measures as are necessary to ensure that all services conform to the Exhibit A – Statement of Work and other subcontract

requirements." *Id.* at 9. Amentum was required to "accept, as promptly as practicable after completion and inspection, all work required by that Subcontract or that portion of the Work PAE [now Amentum] determines can be accepted separately." *Id.* at 10.

23. Subcontract Section I.4, "Changes," obligated Amentum to "make an equitable adjustment in the Contract price and/or delivery schedule" when a written order issued by the Amentum "Procurement Representative" would "cause an increase or decrease in the cost of, or the time required for, performance of any part" of the Subcontract. Ex. 1, Subcontract at 14-15. Similarly, Subcontract Section I.1 of Attachment B included FAR 52.242-14, "Suspension of Work," which entitled Taylors to "any increase in the cost of performance" that is "caused by the unreasonable suspension, delay, or interruption" of performance. Ex. 2, Attachment B at 41.

24. Subcontract Section I.2.11 of Attachment B, "Taxes—Foreign Cost Reimbursement Contracts" provided that "[a]ny tax or duty from which the United States Government is exempt by agreement with the Government of IRAQ [*sic*], or from which the Contractor or any subcontractor under this contract is exempt under the laws of IRAQ, shall not constitute an allowable cost under this contract." Ex. 2, Attachment B at 53.

25. Subcontract Section I.2, "Applicable Laws," provided that any provision of the contract that is: "(i) incorporated in full text or by reference from the Federal Acquisition Regulation (FAR) or; (ii) incorporated in full text or by reference from any agency regulation that implements or supplements the FAR or; (iii) that is substantially based on any such agency regulation or FAR provision, shall be construed and interpreted according to the federal common law of government contracts as enunciated and applied by federal judicial bodies, boards of contract appeals, and quasi-judicial agencies of the federal Government." Ex. 1, Subcontract at 13.

**Amentum failed to secure the release of twenty-five Taylors containers from Iraqi Customs**

26. Pursuant to Amentum's direction, Taylors worked directly with the Embassy to obtain the necessary documents for Taylors' cargo to be cleared by Iraqi Customs. For each imported container, Taylors would apply for Diplomatic Notes and Prime Minister's National Operations Center Letters from the Embassy. These documents informed Customs that the listed containers at issue were for use by DOS personnel and would therefore be cleared through customs without duties. By following these instructions, Taylors delivered duty-free imported foodstuffs for most of the twelve years that PAE/Amentum performed this Subcontract with Taylors.

27. Beginning in April of 2024, Amentum and DOS failed to secure the clearance and release of Taylors' containers from Customs, as required by Subsection H.21 of the Subcontract. Though Taylors had provided the required shipment information to the Embassy, and the Embassy had issued or submitted Diplomatic Notes and Prime Minister's National Operations Center letters for eighteen containers in February of 2024, Customs detained these containers upon their arrival in Umm Qasr.

28. Taylors contacted Customs directly in April of 2024 in an effort to get its containers released. Customs told Taylors that despite the Embassy's paperwork, the Iraqi government disputed whether the diplomatic cargo qualified for clearance as duty-free goods. Customs advised that the issue would need to be addressed through the Iraqi Ministry of Foreign Affairs and the Embassy, and Taylors therefore sought Embassy assistance to resolve the clearance matter with the Iraqi government.

29. Taylors conveyed Customs' response to the Embassy, which disagreed with Customs' interpretation of the duty-free status of goods bound for the U.S. Embassy and BDSC. The Embassy told Taylors that it would contact the Iraqi Ministry of Foreign Affairs and file new

Diplomatic Notes. Meanwhile, additional Taylors containers arrived at Umm Qasr, bringing the total of detained containers to seventeen as of April 23, 2024.

30. For the next six months, Taylors communicated with Customs, Amentum, and DOS several times a week to assist DOS and Amentum in securing clearance for Taylors' containers, as Amentum was obligated to provide under Section H.21 of the Subcontract. During this time, additional containers arrived at Umm Qasr, bringing the detained total to twenty-five.

**Customs released four of Taylors' containers, which were rejected after an improper inspection**

31. In November of 2024, after a delay of more than 200 days, Customs allowed Taylors to begin moving some containers from the Umm Qasr port. Taylors shipped the first four of these containers to DOS' facilities in Baghdad on November 10, 2024. Taylors advised Amentum that the contents of these delayed containers remained frozen or refrigerated as appropriate while at the port, so that while some cargo items may have expired, much would remain usable.

32. On November 11, 2024, Taylors delivered two of the four containers to DOS' facilities in Baghdad. Though Taylors' containers were refrigerated while in port, the batteries of the devices that recorded the containers' internal temperature had died during the delay. Because of the absence of this temperature data, the inspectors rejected all of Taylors' cargo without a complete inspection, though some items were not expired, and others past their 'best-by' date remained usable.

33. Section 10 of the Subcontract required Amentum to physically inspect Taylors' deliveries and to witness or perform such measures as were necessary to ensure conformance with the SOW and other Subcontract requirements. Section 10 further required Amentum to accept, as

promptly as practicable after completion and inspection, all work required by the Subcontract or that portion of the work Amentum determined could be accepted separately.

34. During the parties' multi-year course of performance, Amentum's inspection and acceptance of Taylors' imported food deliveries involved viability-based measures to determine conformance and, where appropriate, acceptance of conforming portions of a delivery that could be accepted separately, rather than summary rejection of entire containers without completing an inspection sufficient to determine conformance.

35. Amentum's Standard Operating Procedure IQ-SOP-FSO-03, 'Food Acquisition and Delivery' ("SOP"), reflects the inspection and acceptance framework Amentum applied in administering food delivery and receipt on this program. The SOP reflects that Amentum's inspection and acceptance framework contemplated documenting delivery irregularities and assessing product viability (including escalation to public health personnel where appropriate), rather than summarily rejecting entire deliveries without a viability-based inspection.

36. Notwithstanding Section 10 and the parties' established inspection and acceptance practice, Amentum rejected Taylors' deliveries without conducting a complete inspection sufficient to determine conformance and viability of the contents, and without accepting those portions of the deliveries that could be accepted separately.

37. Amentum's own actions confirm that the November 2024 deliveries contained separable and usable goods. During the November 13, 2024, delivery, inspectors removed and retained $39,774.30 of dry goods, demonstrating that at least portions of the deliveries were viable and separable even as Amentum rejected the containers in full.

**Amentum directed Taylors not to deliver any additional containers to the Embassy and BDSC**

38. On November 13, 2024, Amentum instructed Taylors to halt delivery of any additional containers that had been delayed more than 180 days under the presumption that the batteries of the temperature monitoring devices in Taylors' shipping containers would have died while the containers were held in port during that interim. Amentum directed Taylors to retain the containers in Umm Qasr rather than deliver them to the Embassy and BDSC because DOS did not want to inspect and pay to dispose of their contents. As a result, Taylors was required to pay for continued storage of the containers in port and a nearby warehouse at Umm Qasr—costs that Amentum was ultimately responsible for under Section H.21(a) of the Subcontract. Taylors had previously warned Amentum that the demurrage costs alone for the undelivered containers could be as high as $8,650 per day.

39. Later in November of 2024, Amentum directed Taylors to find a means for disposing of the cargo of the undelivered containers.

40. On December 5, 2024, Taylors informed Amentum that it had found a local vendor that would dispose of the undelivered cargo at a cost of $8,585 per container. Taylors requested Amentum's confirmation that it should dispose of the containers with this vendor.

41. On January 10th and 13th, 2025, Amentum reversed its earlier position and ordered Taylors not to dispose of the cargo. Taylors therefore retained the seven containers that had been released by Customs in a warehouse while the remaining fourteen containers were held by Customs in port. Meanwhile, Taylors incurred increasing storage and demurrage costs. One of Taylors' carriers threatened that Taylors' supplier would be blacklisted if its shipping containers were not released back to the carrier.

42. Even after Taylors' repeated requests, Amentum offered no further direction regarding disposal of the containers until April 15, 2025, when Amentum stated that "Taylors will need to address internally on how the containers will be released to include addressing final destination of product, and the destruction of expired food products in accordance with local laws."

43. In response to Amentum's direction on April 15, 2025, Taylors instructed its vendor to dispose of the contents of those containers that Customs had released from Umm Qasr. Taylors' vendor completed its disposal by June 26, 2025. However, Customs continued to hold seven containers at Umm Qasr, increasing costs that Amentum was ultimately responsible for under Section H.21(a) of the Subcontract. Taylors renewed its requests for assistance from Amentum in securing the release of these seven containers, but Amentum simply directed Taylors to contact the Embassy.

44. Taylors continued its efforts to work through the Embassy to secure the release of its last seven detained containers. After considerable work, Taylors accomplished their release and disposal by December 21, 2025, without assistance from Amentum, despite Amentum's responsibility to provide duty-free clearance under Section H.21(d) of the Subcontract.

**Amentum denied Taylors' repeated requests for assistance in recovering its costs**

45. On December 16, 2024, Taylors informed Amentum that Taylors' supplier had presented invoices demanding $769,475.03 in costs related to the four delayed containers that were delivered. Taylors requested a commitment that Amentum or DOS would reimburse Taylors for these costs. Amentum did not provide such a commitment, but it pledged to seek reimbursement for the invoices from DOS and stated that it would sponsor Taylors' request for an equitable adjustment should the invoices be denied.

46. On January 15, 2025, Taylors submitted invoices for the four delayed containers that were delivered to post in November of 2024 and subsequently rejected by DOS. Taylors notified Amentum that it would also seek an equitable adjustment for storage, demurrage, and port fees related to the delayed containers.

47. On April 15, 2025, Amentum refused to pay the invoices Taylors submitted for its four delayed containers. Amentum went further, stating that it would refuse to pay any of Taylors' other costs for any of the 25 containers that had been delayed at Umm Qasr. Amentum did not acknowledge its responsibility for paying these costs under Section H.21 of the Subcontract, or the Subcontract's changes clause.

48. Taylors presented a formal Request for Equitable Adjustment to Amentum on May 23, 2025, to recover all the costs Taylors incurred as a result of Amentum's failure to secure clearance of Taylors' containers through Iraqi Customs for more than 200 days.

49. Amentum denied Taylors' request for an equitable adjustment in full on August 6, 2025. Despite the language of Subcontract Attachment B, Amentum argued that the Subcontract did not make Amentum responsible for the risk that containers would not be cleared through Customs or inspected according to the Subcontract's terms.

50. Notwithstanding Amentum's promise to seek reimbursement from DOS and to sponsor Taylors' request for equitable adjustment should DOS deny its invoices, Amentum refused to convey Taylors' request for equitable adjustment to DOS.

**Two final Taylors containers were rejected after a noncompliant inspection**

51. On September 4th and 8th, 2025, Taylors delivered two additional containers to DOS facilities in Baghdad. Unlike the twenty-five containers at issue in Taylors' claim of May 23, 2025,

these last two containers had not been detained by Customs. As a result, these containers arrived in Baghdad with operational temperature monitoring devices.

52. Taylors' containers were rejected without Amentum performing complete inspection and acceptance measures sufficient to determine conformance and viability. Amentum's inspection departed from the requirements of Section 10 of the subcontract, and it failed to follow the parties' course of performance as reflected in Amentum's SOP.

53. The inspectors rejected both deliveries in full based on cursory visual observations of ice crystallization on some frozen products and alleged discrepancies in container seal and tracking data, without performing a complete inspection to determine spoliation or whether conforming portions could be accepted separately.

54. The inspectors also failed to confer with Taylors regarding the inspection findings, departing from the parties' established practice during years of performance. Had Amentum conferred with Taylors, Taylors would have provided vendor documentation and explanations responsive to the limited observations made during the rejection.

55. Finally, Amentum did not allow Taylors to participate meaningfully in inspection of the rejected containers, limiting Taylors' ability to verify the rejection basis and to mitigate its loss.

56. Taylors submitted a claim to Amentum on March 27, 2026, to recover $341,614.44 in costs arising from the flawed inspection and rejection of Taylors' two additional containers. Amentum has failed to grant or deny Taylors' claim as of the filing of this Complaint.

**COUNT I**
**(Breach of Contract—Violation of Subcontract Section H.21(d))**

57. Taylors realleges and incorporates by reference the other allegations of this Complaint as if fully set forth herein.

58. Amentum breached the Subcontract by violating its duty under Section H.21(d) to secure clearance of Taylors' containers, either through paying the customs duties not waived by the Iraqi government or coordinating their release from Iraqi Customs.

59. A claim for breach of contract contains four elements: (1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty, and (4) damages caused by the breach.

60. The parties entered into a valid, binding contract in the form of the Subcontract.

61. Taylors executed its obligations under the Subcontract.

62. Under Section H.21(d) of Subcontract Attachment B, Amentum assumed responsibility "for obtaining customs clearances and for obtaining exemption certifications or paying customs duties not waived, for imported products" on this project. Ex. 2, Attachment B at 13.

63. Section H.21(d) of Subcontract Attachment B allocates outcome responsibility regardless of third-party conduct.

64. Amentum violated this obligation by failing to secure the duty-free clearance of Taylors' twenty-five containers at issue in this dispute. Amentum similarly failed to pay customs duties not waived by the Iraqi government as an alternative to securing duty-free customs clearance. This violation constituted a breach of the Subcontract.

65. As a result of Amentum's breach, Taylors incurred $2,673,591.56 to retain its containers in storage at Umm Qasr and ultimately dispose of spoiled or rejected contents. These costs included payments for demurrage, port fees, electricity charges, customs delay fees, shipping agent fees, and warehouse fees.

66. Additionally, because of Amentum's breach, Taylors' containers were held in port at Umm Qasr for such an extended period that the batteries of the temperature measuring devices for each container failed, and some portion of Taylors' cargo expired. This failure led to DOS' rejection of four containers delivered to DOS facilities in November of 2024, and to Amentum's order for Taylors not to deliver any additional containers to DOS. As a result, Taylors incurred $3,126,312 in damages because it was not reimbursed for the cost of its lost cargo.

67. After accounting for a further $567,811 in indirect costs, Taylors incurred a total of $6,367,714.93 in damages as a result of Amentum's violation of Section H.21(d) and breach of the Subcontract.

## COUNT II
## (Breach of Contract—Violation of Subcontract Section H.21(a))

68. Taylors realleges and incorporates by reference the other allegations of this Complaint as if fully set forth herein.

69. A claim for breach of contract contains four elements: (1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty, and (4) damages caused by the breach.

70. The parties entered into a valid, binding contract in the form of the Subcontract.

71. Taylors executed its obligations under the Subcontract.

72. The Subcontract obligated Amentum to reimburse Taylors for the costs it incurred to import containers of cargo to DOS facilities in Baghdad. Subcontract Section H.21(a) provided that the costs of "packing, handling, cartage, overland freight, ocean freight, transshipment, port, unpacking, storage, and all other charges in connection with obtaining and transporting the materials from their source to the project site shall be allowable costs and reimbursable" under the Subcontract. Ex. 2, Attachment B at 13.

73. Amentum violated Section H.21(a) by refusing to reimburse Taylors for the costs of port, storage, "and all other charges in connection with obtaining and transporting the materials from their source to the project site" for the twenty-five containers at issue in this dispute. This violation constituted a breach of contract.

74. As a result of Amentum's breach of contract, Taylors sustained direct damages in the amount of $2,493,307 in non-reimbursed demurrage, freight, storage, and port fees.

**COUNT III**
**(Breach of Contract—Violation of Subcontract Section I.4)**

75. Taylors realleges and incorporates by reference the other allegations of this Complaint as if fully set forth herein.

76. Amentum breached the Subcontract by violating the Changes clauses contained in Section I.4, which entitled Taylors to an equitable adjustment for changes to the Subcontract ordered by Amentum.

77. A claim for breach of contract contains four elements: (1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty, and (4) damages caused by the breach.

78. The parties entered into a valid, binding contract in the form of the Subcontract.

79. Taylors executed its obligations under the Subcontract.

80. Under Section I.4 of the Subcontract, Amentum was obligated to "make an equitable adjustment in the Contract price and/or delivery schedule" when an order issued by the Amentum "Procurement Representative" would "cause an increase or decrease in the cost of, or the time required for, performance of any part" of the Subcontract. Ex. 1, Subcontract at 14-15.

81. Amentum violated Section I.4 of the Subcontract by refusing Taylors' requests for an equitable adjustment for three changes in the Subcontract's scope of work.

82. Amentum first changed the Subcontract's scope of work on November 14, 2024, when it directed Taylors not to deliver twenty-one of the twenty-five containers to DOS for inspection, allegedly because DOS did not want to incur the cost of inspecting each container's contents and disposing of those items that had expired while the containers waited at Umm Qasr.

83. Amentum changed the Subcontract a second time by ordering Taylors to find a local vendor that would dispose of the contents of its containers. On December 5, 2024, Taylors informed Amentum that it had found a local vendor that would dispose of the undelivered cargo at a cost of $8,585 per container. Taylors requested Amentum's confirmation that it should dispose of the containers with this vendor. Amentum refused to authorize Taylors to dispose of the containers at issue.

84. Amentum changed the Subcontract's scope of work a third time on January 10, 2025, when it expressly ordered Taylors not to dispose of the containers at issue until further notice.

85. As a result of these orders, Taylors incurred $2,493,307 in costs from April 4, 2024, until December 8, 2025, to retain the twenty-one containers at Umm Qasr. Taylors incurred an additional $180,285 in costs to dispose of the contents of the twenty-one containers. Taylors incurred unreimbursed costs in the amount of $3,126,312 for cargo that Amentum's change order prohibited Taylors from delivering to DOS. Finally, Taylors incurred $567,811 in indirect costs arising from these changes.

86. Taylors sought to recover its costs for these changes by submitting a request for equitable adjustment to Amentum on May 23, 2025. The quantum of Taylors' request reflected its continuing demurrage and port fee costs through the end of April 15, 2025, as well as Taylors' G&A and indirect costs for these changes. Amentum violated Section I.4 and breached the

Subcontract by refusing Taylors' request for equitable adjustment in its entirety on August 6, 2025. This breach damaged Taylors in the amount of $6,367,714.93.

**COUNT IV**
**(Breach of Contract—Inspections)**

87. Taylors realleges and incorporates by reference the other allegations of this Complaint as if fully set forth herein.

88. Amentum breached the Subcontract by violating Subcontract Section 10, which obligated Amentum to inspect and accept portions of Taylors work that conformed to contract requirements.

89. A claim for breach of contract contains four elements: (1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty, and (4) damages caused by the breach.

90. The parties entered into a valid, binding contract in the form of the Subcontract.

91. Taylors executed its obligations under the Subcontract.

92. Subcontract Section 10 obligated Amentum to "physically inspect the [Subcontract] Work, and witness or perform such measures as are necessary to ensure that all services conform to the Exhibit A – Statement of Work and other subcontract requirements." Ex. 1, Subcontract at 9. Amentum was required to "accept, as promptly as practicable after completion and inspection, all work required by that Subcontract or that portion of the Work PAE [now Amentum] determines can be accepted separately." *Id.* at 10.

93. First, Amentum failed to inspect Taylors' deliveries of November 11th and 13th, 2024, as required by Section 10, including failing to perform measures necessary to determine conformance and failing to accept separable conforming goods. Amentum's long-standing

inspection practices, reflected in its SOP, confirm the kinds of measures Amentum applied during performance and underscore the departure here.

94. Amentum did not inspect Taylors' cargo for spoliation, instead summarily rejecting the entire shipment because the batteries of the temperature monitoring devices of the containers had died while the containers were held by Iraqi Customs. Amentum did not refer items that had reached their stated expiration date to Amentum's Public Health representative for further examination, consistent with Amentum's longstanding inspection practices, as reflected in the SOP. Amentum did not accept that portion of Taylors' delivered cargo that had not yet expired and could be accepted separately.

95. Second, Amentum failed to inspect the contents of Taylors' remaining twenty-one containers that had been held by Iraqi Customs. Instead, Amentum summarily rejected all contents of these containers without inspection by ordering Taylors, on November 14, 2024, not to deliver these containers to DOS facilities.

96. Third, Amentum departed from the SOP and the parties' course of performance in its complete rejection of two Taylors containers on September 4th and 8th, 2025. Amentum failed to identify evidence of spoliation, accept conforming portions of Taylors' cargo, or confer with Taylors regarding the discrepancies identified by the inspectors. Amentum additionally failed to cooperate with Taylors by failing to provide Taylors an opportunity to make its own inspection of the rejected containers.

97. Amentum's violations of Section 10 breached the Subcontract and damaged Taylors by preventing it from being reimbursed for the value of the rejected cargo. These damages—reflecting the value of the rejected cargo plus G&A—totaled $3,773,993.

**COUNT V**
**(Breach of Contract—Violation of the Implied Duty of Good Faith and Fair Dealing)**

98. Taylors realleges and incorporates by reference the other allegations of this Complaint as if fully set forth herein.

99. Every contract imposes upon each party a duty of good faith and fair dealing in its performance and enforcement. These duties include the duty to cooperate and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract.

100. While the implied duty of good faith and fair dealing exists because it is rarely possible to anticipate in contract language every possible action or omission by a party that undermines the bargain, the nature of that bargain is central to keeping the duty focused on honoring the reasonable expectations created by the autonomous expressions of the contracting parties. Thus, the implied duty of good faith and fair dealing is limited by the bargain: it prevents a party's acts or omissions that, though not proscribed by the contract expressly, are inconsistent with the contract's purpose and deprive the other party of the contract's contemplated value.

101. Amentum breached the Subcontract through three violations of the duty of good faith and fair dealing.

102. First, Amentum failed in its duty to cooperate with Taylors by reversing its order directing Taylors to dispose of cargo that Amentum had rejected. It was unreasonable for Amentum to prohibit Taylors from disposing of cargo that Amentum itself had ordered Taylors not to deliver to the DOS customer, since such disposal was Taylors only means of mitigating its damages. As a result, Taylors incurred $2,674,092 in port, storage, demurrage, and warehousing fees from April 4, 2024, through December 8, 2025.

103. Second, Amentum failed in its duty to cooperate with Taylors in requesting reimbursement for Taylors' costs from DOS. Despite assuring Taylors, on January 13, 2025, that

Amentum would seek reimbursement of Taylors' costs from DOS, Amentum failed to submit a formal request for equitable adjustment to DOS' Contracting Officer in order to recover Taylors' claimed costs. Amentum's failure was unreasonable and constituted a reversal of its earlier promise to seek to recover Taylors' costs from the government.

104. Third, Amentum failed in its duty to cooperate with Taylors in its inspections of two of Taylors' containers on September 4th and 8th, 2025. By breaking with the course of performance and failing to confer with Taylors regarding the alleged deficiencies in Taylors' delivery, and by refusing Taylors the opportunity to conduct its own inspection of the containers, Amentum prevented Taylors from mitigating its damages and recovering the fruits of the Subcontract.

105. Amentum's violations of the implied covenant of good faith and fair dealing denied Taylors its reasonably anticipated fruit of the Subcontract—namely, the reimbursement of Taylors' costs to import diplomatic cargo to Baghdad. Amentum's violation of the implied duty breached the Subcontract and caused Taylors to incur $6,709,329.37 in damages, reflecting the costs in demurrage, storage, port and warehousing fees as well as the value of the claims that Amentum refused to submit to DOS.

**PRAYER FOR RELIEF**

WHEREFORE, Taylors respectfully requests that this Court award Taylors total damages in the amount of $6,709,329.37, reflecting Taylors' overlapping recovery under the Counts it alleges in this Complaint. Taylors respectfully requests that this Court:

(a) For Count I, award damages in the amount of at least $6,367,714.93, (subject to proof at trial), plus interest on Taylors' unpaid invoices.

(b) For Count II, award damages in the amount of at least $2,493,307 (subject to proof at trial), plus interest on Taylors' unpaid invoices.

(c) For Count III, award damages in the amount of at least $6,367,714.93 (subject to proof at trial), plus interest on Taylors' unpaid invoices.

(d) For Count IV, award damages in the amount of at least $3,773,993 (subject to proof at trial), plus interest on Taylors' unpaid invoices.

(e) For Count V, award damages in the amount of at least $6,709,329.37 (subject to proof at trial), plus interest on Taylors' unpaid invoices.

For all Counts, award such additional or alternative relief as the Court deems just and proper.

Respectfully submitted,

*/s/ Samuel Van Kopp*
Samuel Van Kopp
VA Bar No. 95044
CORDATIS LLP
4250 North Fairfax Drive
Suite 600
Arlington, VA 22209
(202) 342-2550
svankopp@cordatislaw.com

Dated: October 21, 2026

*Counsel for Taylors International Services, Inc.*